## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| KIARAN SHADOWBOLT, derivatively on behalf of, FIREFLY AEROSPACE INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON KIM, DARREN MA, REMINGTON WU, JORDI PAREDES GARCIA, KIRK KONERT, THOMAS MARKUSIC, MARC WEISER, JED MCCALEB, THOMAS ZURBUCHEN, CHRISTOPHER EMERSON, RYAN BOLAND, PAMELA BRADEN, JON LUSCZAKOSKI, and KEVIN MCALLISTER <br><br> Defendants, <br><br> and <br><br> FIREFLY AEROSPACE INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-2126 <br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Kiaran Shadowbolt ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Firefly Aerospace Inc. ("Firefly" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jason Kim ("Kim"), Darren Ma ("Ma"), Remington Wu ("Wu"), Jordi Paredes Garcia ("Garcia"), Kirk Konert ("Konert"),

1

Thomas Markusic ("Markusic"), Marc Weiser ("Weiser"), Jed McCaleb ("McCaleb"), Thomas Zurbuchen ("Zurbuchen"), Christopher Emerson ("Emerson"), Ryan Boland ("Boland"), Pamela Braden ("Braden"), Jon Lusczakoski ("Lusczakoski"), and Kevin McAllister ("McAllister") (the "Individual Defendants," and collectively with Firefly, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Firefly, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Firefly, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Firefly's directors and officers from August 7, 2025 through September 29, 2025, both dates inclusive (the "Relevant Period").

2.      Firefly is a Texas space and defense technology company with the goal of enabling "responsive, regular, and reliable launch, transit, and operations in space for our customers across the globe." Firefly currently serves customers in national security, government, and commercial spaces. Firefly is split into two operating segments: Launch Solutions, which is made up of the Alpha and Eclipse rockets, and Spacecraft Solutions, which is made up of the Company's Blue Ghost lander and Elytra products.

3.      Alpha is Firefly's flagship launch rocket, which the Company describes as the "the only provider of small size launch that has achieved orbit and addresses a critical gap in the market in the 1,000 kilograms category." However, the Alpha rocket has gone through a difficult development. For example, the Company attempted to launch the Alpha rocket six times, but four of the attempted launches ended in failure. As a result of such failures, on April 29, 2025, the Federal Aviation Administration ("FAA") ordered Firefly to investigate the root cause of the Alpha rocket failures. The FAA further instructed Firefly to submit a detailed report on its findings and to identify corrective actions necessary to avoid a future launch failure. The FAA halted all future Alpha Rocket launches until the FAA received and reviewed the report.

4.      Firefly launched an Initial Public Offering ("IPO") on August 7, 2025, selling 19.296 million shares of common stock priced at $45.00 per share.

5.       Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the commercial prospects of the Alpha rocket program and the demand for the Company's Spacecraft Solutions segment. For example, on August 8, 2025, the Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO (the "Form 424B4"). The Form 424B4 touted the commercial viability of

the Alpha rocket, stating in relevant part: "***Our Alpha launch vehicle is the only orbit-ready U.S. rocket*** in the 1,000 kilograms payload vehicle class."[1]

6.    Additionally, on August 26, 2025, the Company issued a Current Report on Form 8-K stating that the FAA granted clearance to conduct additional launch attempts for the Alpha rocket (the "FAA Clearence Form 8-K"). Specifically, the FAA Clearence Form 8-K touted the corrective actions taken by the Company, stating, in relevant part:

> The company conducted a thorough investigation with the FAA and in parallel assembled an Independent Review Board of multiple government agencies, customers, and industry experts. The findings confirmed Firefly's flight safety system performed nominally through all phases of flight. Both Alpha stages landed safely in the Pacific Ocean and the launch posed no risk to public safety.

> …

> ***Fortunately, the corrective actions are straight forward:*** increase thermal protection system thickness on Stage 1 and reduce angle of attack during key phases of the flight. ***Corrective actions have already been implemented.***

> "At Firefly, technical challenges aren't roadblocks — they're catalysts," said Jordi Paredes Garcia, Alpha Chief Engineer at Firefly Aerospace. "Each mission provides us more data and enables us to continuously improve. ***Following all the lessons learned and corrective actions implemented, we were able to further increase Alpha's reliability***. We are grateful to the FAA, our customers, and the independent review board for their continued support through this process."

> ***With FAA approval to return to flight and corrective actions implemented,*** Firefly is now working to determine the next available launch window for Alpha Flight 7.

7.    The truth began to emerge on September 22, 2025, when the Company issued a press release reporting disappointing financial results for the second quarter of 2025 (the "2Q 2025 Earnings Press Release"). The 2Q 2025 Earnings Press Release reported a loss of $80.3 million, compared to a loss of $58.7 million for the second quarter of 2024. Additionally, the 2Q 2025

---

[1] All emphasis has been added unless otherwise stated.

4

Earnings Press Release revealed Space Solutions revenue of $9.2 million, representing a decrease from $50.69 million in the previous quarter.

8.      On this news, the price of the Company's stock fell $7.58 per share, or 15.3%, from a closing price of $49.52 per share on September 22, 2025 to close at $41.94 per share on September 23, 2025.

9.      The truth fully emerged on September 29, 2025, when the Company disclosed on its website that the seventh launch attempt for the Alpha rocket ended in failure (the "Alpha Launch Failure Website Disclosure"). Specifically, the Alpha Launch Failure Website Disclosure stated in relevant part, that "[d]uring testing at Firefly's facility in Briggs, Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event that resulted in a loss of the stage."

10.     On this news, the price of the Company's stock fell $7.64 per share, or 20.7%, from a closing price of $36.96 per share on September 29, 2025 to close at $29.32 per share on September 30, 2025.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the demand and growth potential in Firefly's Space Solutions segment was overstated; and (2) the Alpha rocket's operational and commercial viability was overstated.  As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), it's Chief Accounting Officer ("CAO"), its Alpha Chief Engineer, and several of its directors a federal securities fraud class action lawsuit pending in the United States District Court for the Western District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Texas or who has minimum contacts with this District to justify the exercise of jurisdiction over them

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Firefly and has continuously held Company common stock at all relevant times.

### Nominal Defendant Firefly

22.    Firefly is a Delaware corporation with its principal executive offices at 1320 Arrow

Point Drive #109, Cedar Park, TX. Firefly's shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FLY."

**Defendant Kim**

23.    Defendant Kim has served as a Company director and as its CEO since October 2024.

24.    The Form 424B4 stated the following about Defendant Kim:

**Jason Kim** has served as our Chief Executive Officer and as a member of our Board since October 2024. He previously served as Chief Executive Officer of Millennium Space Systems from December 2020 to September 2024 and as Vice President of Strategic Planning from September 2009 to December 2019. Mr. Kim has also held positions with Raytheon and Northrop Grumman. Mr. Kim attended the United States Air Force Academy, where he earned a BS in Electrical Engineering, and served in the United States Air Force from 1999 to 2006. Mr. Kim also earned a MS in Electrical Engineering from the U.S. Air Force Institute of Technology and an MBA from UCLA Anderson School of Management. We believe that Mr. Kim is qualified to serve as a director given his deep industry experience and his insight into our business as our Chief Executive Officer.

**Defendant Ma**

25.    Defendant Ma has served as the Company's CFO since August 2020.

26.    The Form 424B4 stated the following about Defendant Ma:

**Darren Ma** has served as our Chief Financial Officer since August 2020. Prior to that, Mr. Ma served as Chief Financial Officer and Senior Vice President of Spectra7 Microsystems from November 2017 to July 2020 and as Chief Financial Officer of GigPeak, Inc. from October 2014 to September 2017. Mr. Ma has also previously served as a business unit controller at Semtech (NASDAQ: SMTC) and a finance manager at Intel (NASDAQ: INTC). Mr. Ma received a BS in Managerial Economics from UC Davis and an MBA from the W.P. Carey School of Business at Arizona State University.

**Defendant Wu**

27.    Defendant Wu has served as the Company's CAO since March 2025.

**Defendant Garcia**

28.    Defendant Garcia has served as the Company's Alpha Chief Engineer since January 2021 and as the Company's Corporate Chief Engineer since February 2025.

**Defendant Konert**

29.    Defendant Konert has served as a member of the Board since March 2022. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

30.    The Form 424B4 stated the following about Defendant Konert:

**Kirk Konert** has served as a member of our Board since March 18, 2022. Since December 2023, Mr. Konert has been a Managing Partner at AE Industrial Partners. Prior to that, Mr. Konert was a Partner at AE Industrial Partners from October 2019 to December 2021, and a Principal from August 2014 to October 2019. Mr. Konert currently serves on the board of directors of BigBear.ai (NYSE: BBAI), Calca Solutions, Redwire (NYSE: RDW), ThayerMahan, and York Space Systems. Previously, Mr. Konert was a Senior Associate at Sun Capital Partners from July 2011 to July 2014 and was an analyst with Wells Fargo Securities' Industrial Group from June 2009 to June 2011. Mr. Konert earned a BA in Economics at Davidson College. We believe that Mr. Konert is qualified to serve as a director given his leadership and transactional experience.

**Defendant Markusic**

31.    Defendant Markusic has served as the Company's Chief Technical Advisor since July 2022. He previously served as the Company's CEO from January 2014 until April 2023.

**Defendant Weiser**

32.    Defendant Weiser has served as a Company director since October 2024. He also serves as a member of the Compensation Committee.

33.    The Form 424B4 stated the following about Defendant Weiser:

**Marc Weiser** has served as a member of our Board since October 2024. Mr. Weiser is the Founder and Managing Director of RPM Ventures, a venture capital firm, where he has been investing since May 2000. Mr. Weiser has served on the board of directors of numerous privately held companies during that time.

9

Mr. Weiser earned a BA in Aerospace Engineering and an MBA from the University of Michigan. We believe that Mr. Weiser is qualified to serve as a director given his experience leading corporate strategy discussions at the board level and experience with developing and implementing strategies for growth and optimization, including partnerships, mergers and acquisitions, joint ventures, and divestitures.

### Defendant McCaleb

34.    Defendant McCaleb served as a Company director prior to the Company's IPO on August 7, 2025.

### Defendant Zurbuchen

35.    Defendant Zurbuchen has served as a Company director since May 2025. He also serves as a member of the Nominating and Corporate Governance Committee.

36.    The Form 424B4 stated the following about Defendant Zurbuchen:

**Thomas Zurbuchen** has served as a member of our Board since May 2025. Since June 2023, Mr. Zurbuchen has led the ETH Space initiative at ETH Zürich Space, a public university in Germany. Mr. Zurbuchen currently serves as a member of the board of advisors of Voyager Space, as a member of the board of McKinley Inc., and serves on the board of directors of the Schindler Group. Prior to that, Mr. Zurbuchen was Associate Administrator at the National Aeronautics and Space Association Science Mission Directorate from October 2016 to December 2022. Prior to that, from September 2014 to October 2016, Mr. Zurbuchen worked as a Talent Acquisition Specialist at eLab Ventures. From February 1998 to October 2016, Mr. Zurbuchen held various educational leadership positions at the University of Michigan, including as a Research Scientist from January 1998 to September 2003, as the Director of the Center for Entrepreneurship from October 2007 to August 2009, and as a professor from September 2003 to October 2016. Mr. Zurbuchen earned an MS and a PhD in physics from the University of Bern. We believe Mr. Zurbuchen is qualified to serve as a director given his technical background and extensive leadership experience in private and public institutions.

### Defendant Emerson

37.    Defendant Emerson has served as a Company director since September 2022. He also serves as a member of the Nominating and Corporate Governance Committee.

38.     The Form 424B4 stated the following about Defendant Emerson:

**Christopher Emerson** has served as a member of our Board since September 2022. Since January 2024, Mr. Emerson has been a Senior Partner at AE Industrial Partners and was an Operating Partner from October 2022 to January 2024. Mr. Emerson currently serves as Chairman of the board of ALL.SPACE, Chairman of the board of Spirent Federal Systems, and on the board of directors of Belcan, York Space Systems LLC and The Atlas Group. Previously, Mr. Emerson served on the board of directors at Hidden Level Inc. from May 2022 to October 2024 and HawkEye 360 from September 2019 to November 2021. Mr. Emerson served as Chairman of the board of Airbus U.S. Space & Defense, Inc. (OTCMKTS: EADSY) from October 2021 to February 2022, Chairman of the Board and President of Airbus U.S. Space & Defense, Inc. from July 2019 to October 2021, and President of Airbus Helicopters, Inc. from June 2015 to July 2019. From 2003 to 2015, Mr. Emerson served in various roles at Airbus U.S. Space & Defense, Inc., including as Senior Vice President and Chief Financial Officer. Mr. Emerson earned a BAS in International Economics from the University of Alabama. We believe that Mr. Emerson is qualified to serve as a director given his experience in the aerospace industry and extensive leadership experience.

## Defendant Boland

39.     Defendant Boland has served as a Company director since the Company's IPO on

August 7, 2025. He also serves as a member of the Audit Committee.

40.     The Form 424B4 stated the following about Defendant Boland:

**Ryan Boland** will serve as a director upon completion of this offering. Since January 2024, Mr. Boland has served as Chief Executive Officer of ElementUSA Minerals and has served on their board of directors since April 2022. Mr. Boland has served on the board of directors of Lulu Snacks, Inc. since January 2025. Mr. Boland has served as the Chief Executive Officer of a private family office since December 2016. Prior to that, Mr. Boland worked at J.P Morgan from July 2005 to December 2016 in various executive roles across the Investment Bank and Private Bank departments, most recently as Executive Director of Global Investments, Private Bank. Mr. Boland earned a BS in Accounting from Villanova University. We believe Mr. Boland is qualified to serve as a director given his financial expertise and management credentials.

## Defendant Braden

41.     Defendant Braden has served as a Company director since the Company's IPO on

August 7, 2025. She also serves as a member of the Audit Committee.

42.     The Form 424B4 stated the following about Defendant Braden:

**Pamela Braden** will serve as a director upon completion of this offering. Since February 2022, Ms. Braden has been an Operating Partner at AE Industrial Partners. Ms. Braden currently serves on the board of directors of BigBear.ai (NYSE: BBAI) and REDLattice, and previously served on the board of directors of Belcan. Prior to joining AE Industrial Partners, Ms. Braden was the Chief Executive Officer and Founder of the digital engineering services firm Gryphon Technologies from January 1998 to December 2021. Prior to that, Ms. Braden served as an executive at various government sector-focused startups. Ms. Braden earned a BA in Political Science from the University of Akron. We believe Ms. Braden is qualified to serve as a director given her experience in the defense industry and as an executive for complex technology companies.

**Defendant Lusczakoski**

43.     Defendant Lusczakoski served as a Company director since the Company's IPO on

August 7, 2025. He also serves as a member of the Compensation Committee.

44.     The Form 424B4 stated the following about Defendant Lusczakoski:

 **Jon Lusczakoski** will serve as a director upon completion of this offering. Since August 2024, Mr. Lusczakoski has been a Principal at AE Industrial Partners and previously was a Vice President from August 2021 to August 2024, a Senior Associate from October 2020 to August 2021 and an Associate from August 2018 to October 2020. Mr. Lusczakoski currently serves on the board of directors of Calca Solutions and the National Security Space Association. Prior to joining AE Industrial Partners in August 2018, Mr. Lusczakoski was a Lead Engineer in the Program Development group at Williams International from June 2012 to July 2018. Mr. Lusczakoski earned a BS in Mechanical Engineering from Michigan State University and an MBA from the University of Michigan. We believe Mr. Lusczakoski is qualified to serve as a director given his technical background.

**Defendant McAllister**

45.     Defendant McAllister served as a Company director since the Company's IPO on August 7, 2025. He also serves as the Chair of the Nominating and Corporate Governance Committee.

46.     The Form 424B4 stated the following about Defendant McAllister:

**Kevin McAllister** will serve as a director upon completion of this offering. Since June 2020, Mr. McAllister has been a Senior Operating Partner and Co-Head of the Portfolio Strategy and Optimization Group at AE Industrial Partners. Mr. McAllister currently serves on the board of directors of Embraer S.A. (NYSE: ERJ). Mr. McAllister previously served as the Chairman of the board of directors of Belcan. Prior to joining AE Industrial in June 2020, Mr. McAllister served as President and Chief Executive Officer of Boeing Commercial Airplanes from December 2016 to October 2019. Prior to that, Mr. McAllister worked at GE Aerospace (NYSE: GE) from 1989 to 2016, where he most recently served as President and Chief Executive Officer of GE Aviation Services from 2014 to 2016 and was previously Vice President and General Manager of Global Sales and Marketing from 2008 to 2014. He also held multiple leadership roles at GE Aviation across Global Customer and Product Support, Overhaul & Component Repair Operations, Lean Six Sigma, and Engineering. Mr. McAllister earned a BS in Metallurgical and Materials Engineering from the University of Pittsburgh. We believe Mr. McAllister is qualified to serve as a director given his leadership experience in the aerospace industry.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers, directors, and/or fiduciaries of Firefly and because of their ability to control the business and corporate affairs of Firefly, the Individual Defendants owed Firefly and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Firefly in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Firefly and its shareholders so as to benefit all shareholders equally.

13

48.     Each director and officer of the Company owes to Firefly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Firefly, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, officers and directors of Firefly were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Firefly, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Firefly Board at all relevant times.

52.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53.     To discharge their duties, the officers and directors of Firefly were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the directors and/or officers of Firefly were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Firefly's own Code of Business Conduct ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Firefly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices;

      (d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Firefly and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Firefly's operations would comply with all applicable laws and Firefly's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.      Each of the Individual Defendants further owed to Firefly and the shareholders the duty of loyalty requiring that each favor Firefly's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

16

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Firefly and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, directorial, and controlling positions with Firefly, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Firefly.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Firefly was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Firefly and was at all times acting within the course and scope of such agency.

## FIREFLY'S CODE OF CONDUCT

63.     Firefly's Code of Conduct states that "Every Firefly employee, officer and board member is expected to read, understand, and comply with our Code."

64.     In a section titled "We Do the Right Thing," under a subheading titled "Comply with the Code," the Code of Conduct states, in relevant part:

Our Code is an important expression of our values and helps us make decisions that build and preserve trust and respect with our customers, suppliers, investors, governments, other third parties, and each other. It is a statement of our shared values that helps us operate openly, honestly, and ethically. Along with our Code, we adhere to all Firefly policies.

We seek guidance if we have questions about the Code. We complete our assigned training in a timely manner.

***

It is our responsibility to respond to inappropriate and unethical behavior. Failing to comply with our Code, Firefly's policies, or applicable law and regulations may lead to additional required training, disciplinary action, up to and including termination of employment or service.

We take alleged violations of our Code, our policies or applicable law seriously, and if someone raises a concern, it will be investigated fairly and promptly by the Legal and Compliance Department. If you are asked to help with the investigation of a matter, be candid and cooperative and avoid discussing the matter with others. Firefly has formed a Compliance Committee of executives and subject matter experts to ensure compliance concerns are addressed and resolved appropriately.

65.    In the same section, under a subheading "Comply with Applicable Laws," the Code of Conduct states that the Company will "comply with applicable laws and regulations. If we become aware of a conflict between our Code and other legal requirements, we consult with the Legal Department."

66.    In the same section, under a subheading titled "Questions & Concerns," the Code of Conduct states:

Doing the right thing means being proactive. We ask questions, seek guidance and voice concerns when we are unsure about a situation or behavior.

Suspected violations of our Code or our policies can be reported using several methods. Employees may report concerns or suspected violations of our Code or our policies to a manager, a human resources or legal representative, or Firefly-Compliance. Each will respond and promptly elevate it by emailing Firefly Compliance.

Additionally, our Speak Up Helpline is a confidential, third-party service available online and by phone, 24 hours a day, 7 days a week. You can raise an issue using your name or on an anonymous basis.

67.    In the same section, under a subheading titled "Non-Public Information," the Code of Conduct states:

We maintain trust with our stockholders and the public by respecting securities laws. In the course of our work, we may become aware of material, nonpublic information about Firefly or companies that Firefly does business with. Information is considered "material" if a reasonable person would consider it important in deciding whether to buy or sell a company's securities. Information is "non-public" if it has not been broadly communicated to the public.

We do not trade stock or other securities of Firefly while we are aware of material, non-public information or, if applicable, outside of designated trading periods (unless under a 10b5-1 trading plan).

We do not trade stock or other securities of other companies Firefly does business with while we are aware of non-public information about them, including information that we learn through our work with Firefly.

We do not discuss material, non-public information about Firefly with anyone inside or outside the company without a valid need to know.

We do not make recommendations to anyone regarding the buying, selling, or holding of Firefly stock.

Our Insider Trading Policy contains more information about compliance with securities laws if you intend to trade stock or other securities of Firefly.

68.    In a section titled "We Do What We Promise," under a subheading titled "Use of Company Resources," the Code of Conduct states:

We use company resources responsibly and for legitimate business purposes. We protect them from misuse, damage or loss. Limited occasional use of certain assets, such as electronic mail and internet access, for personal reasons is permitted, but such use should never interfere with our company responsibilities. Improper use of company resources can create risks to the company, impact our financial obligations, or result in violations of laws.

20

69.     In the same section, under a subheading titled "Books & Records," the Code of

Conduct states:

> We prepare and manage our business and financial records with integrity, accuracy, and transparency, while never compromising confidential information. We promptly and accurately enter all business and financial transactions in our books and records. We never misrepresent facts or falsify records. Accurate recordkeeping also means complying with our policies that relate to accounting procedures, financial controls, and records management.

> We are committed to the full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, including those in compliance with applicable securities laws.

> Misstating financial results, incorrectly describing business transactions or destroying records in violation of our policies may be forms of fraud and can lead to serious civil and criminal penalties.

70.     In the same section, under a subheading titled "We Avoid Conflicts of Interest,"

the Code of Conduct states, in relevant part:

> We are trusted to always make decisions in the best interest of Firefly and refrain from engaging in activities that create, or even appear to create, conflicts of interest. Conflicts of interest can arise when personal interests or family or other allegiances are at odds with Firefly's interests. We promptly disclose potential conflicts of interest, so that they can be properly managed or avoided.

> Even the appearance of a conflict of interest can lead others to think we are acting improperly and in turn erode the trust that our employees, customers, suppliers, and other third parties place in us.

71.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse

of control, waste of corporate assets, unjust enrichment, violations of the Securities Act and the

Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the

21

Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## FIREFLY'S AUDIT COMMITTEE CHARTER

72.     The Company also maintains a Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee as:

> The purpose of the Committee is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements and to assist the Board to fulfill the Board's oversight responsibilities with respect to the quality and integrity of the Company's financial statements, the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, as well as the qualifications, independence and performance of the Independent Auditors.

> In fulfilling this purpose, the Committee is responsible for maintaining free and open communication between the Committee, the Internal Auditors, the Independent Auditors, and Company management and for determining that all parties are aware of their responsibilities.

73.     In a section titled "Responsibilities," under a subheading titled "Annual Financials and Audit; Quarterly Release of Financial Information," the Audit Committee Charter defines the responsibility of the Audit Committee in relevant part, as:

> 7. Review and discuss with the Independent Auditors: the Independent Auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process; the overall audit strategy, planning and staffing; the scope and timing of the annual audit; any significant risks identified during the Independent Auditors' risk assessment procedures; and, when completed, the results of the annual audit, including significant findings as well as critical accounting policies and practices used by the Company.

***

10.Review and discuss with management and the Independent Auditors the Company's annual financial statements (including the related notes), the form of audit opinion proposed to be issued by the Independent Auditors on the financial statements and the disclosure "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K, before such report is filed with the SEC. The Committee shall recommend to the Board, based on the Audit Committee's review and discussion with management and the independent auditor, whether the audited financial statements should be included in the Company's annual report on Form 10-K.

11.Review, in consultation with management, the Internal Auditors and the Independent Auditors, the adequacy and effectiveness of the Company's internal control over financial reporting (ICFR) and disclosure controls and procedures (DCP), including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps performed in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such controls and, if applicable, management's and the Independent Auditor's report on the effectiveness of the Company's ICFR and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

12.Review and discuss with management and the Independent Auditors the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q, before such report is filed with the SEC.

13.Review and discuss with management and the Independent Auditors, as appropriate, earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information, as well as the substance of any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and the type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

74.     In the same section, under a subheading titled "Compliance and Risk Management," the Audit Committee Charter defines the responsibilities of the Audit Committee in relevant part, as:

> 20.Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters as required by applicable law and as deemed appropriate.
>
> ***
>
> 22.Monitor compliance with the Company's Code of Business Conduct and oversee the investigation of any alleged breach or violation thereof by the Company's executive officers.
>
> 23.Taking into consideration the allocation of responsibility for risk oversight to other committees of the Board, review and discuss with management the Company's processes and policies on risk identification, management and assessment related to the Company's major financial risk exposures and also cybersecurity risks and the steps taken by management to monitor and mitigate or otherwise control these exposures and risks, including internal controls, insurance coverage and strategies and information security.

75.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations,

act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.    Firefly is a Texas-based space and defense technology company with the goal of enabling "responsive, regular, and reliable launch, transit, and operations in space for our customers across the globe." Firefly currently serves customers in national security, government, and commercial spaces. Firefly is split into two operating segments: Launch Solutions and Spacecraft Solutions.

77.    The Launch Solutions segment is comprised of two launch vehicles: the Alpha rocket and the Eclipse rocket. The Alpha rocket is the first U.S.-based orbital rocket in the 1,000 kilograms class to successfully reach orbit. The Alpha rocket has been launched in responsive space missions, which the Company touts as a "significant differentiator for Firefly and a critical national defense solution." The Eclipse rocket is expected to first launch as early as 2026 and is a reusable and scaled up version of the Alpha rocket. The Eclipse rocket is expected to deliver payloads to Low Earth Orbit and access Medium Earth orbit, Geostationary Orbit, Highly Elliptical Orbit, and Trans-lunar Injection.

78.    The Spacecraft Solutions segment is comprised of the Blue Ghost lander and the Elytra. The Company highlights that the Blue Ghost lander is "the only commercial vehicle to ever achieve a fully successful Moon landing and the first U.S.- based lander to successfully complete a lunar surface mission since NASA's Apollo 17 in 1972." Firefly describes the Elytra as a "high thrust spacecraft platform creating new categories for space domain awareness and warfighting,

long-range communications relays, on-orbit edge processing, and advanced space exploration." The Company expects Elytra to support near-term Blue Ghost lander missions.

79.    The Alpha rocket has had a rocky development, including four failed attempted flights. On April 26, 2025, the Alpha rocket had another failed launch which prompted the FAA to order the Company to investigate the root cause of the failure, identify corrective actions to be taken to avoid future failures, and to submit a report detailing its findings. As a result, the FAA prohibited the Company from conducting further Alpha rocket launches until the report was received and accepted by the FAA.

80.    On July 11, 2025, the Company filed a registration statement on Form S-1 with the SEC (the "Form S-1") which forms part of the registration statement and was declared effective by the SEC on August 6, 2025, after several amendments.

81.    Firefly launched its IPO on August 7, 2025, selling 19.296 million shares of common stock priced at $45.00 per share.

82.    On the same day, during premarket hours, Defendant Kim appeared on CNBC to discuss the IPO. During his appearance, Defendant Kim represented hat the Company's "revenue-generating" products were "all mature," and highlighted the Company's spacecraft Solution segment, stating, in relevant part:

> We've really set up ourselves for going public since our inception. ***We've got four revenue-generating products that are all mature, and we've got flight heritage on our Alpha rocket just on our second launch. And we've landed on the moon. We're the first company to commercially land on the moon successfully – upright, stable.*** And everybody talks about the landing but it's more about the mission, the fourteen day surface operations and provided all that data to NASA and all ten NASA science experiments got all the missions objectives completed.

**Materially False and Misleading Statements**

26

### *The Registration Statement*

83.     On August 8, 2025, the Company filed the Form 424B4 with the SEC (together with the Form S-1, the "Registration Statement").

84.     The Registration Statement represented to investors that the Company was "one of the only U.S.-based commercial companies ***currently equipped to provide reliable access to launch, transit, and operations in space***." The Registration Statement further described the Company as "poised to grow in this attractive market."

85.     The Registration Statement also highlighted the commercial readiness of the Alpha rocket, stating in relevant part: "***Our Alpha launch vehicle is the only orbit-ready*** U.S. rocket in the 1,000 kilograms payload vehicle class." The Registration Statement further discussed the strength of the Company's "reliability-first approach" and the launch of the Alpha Rocket, stating, in relevant part:

> ***We have taken a reliability-first approach to building our launch vehicles,*** landers, and spacecraft. ***We successfully built the world's largest all-composite launch vehicle, our Alpha rocket***. Our rockets are built using lightweight and strong carbon fiber, leveraging automated fiber placement technology to ensure unified production methodology across all of our product lines.

86.     Firefly also touted the operational viability of the Alpha rocket, stating that Firefly was "on track" to facilitate a variety of services to customers. Specifically, the Registration Statement stated, in relevant part:

> Our growth opportunity is dependent on our continued ability to expand our addressable launch market, win lunar and orbital missions and expand our portfolio of services related to those offerings. ***For instance, building on our launch, lander, transit, and operations success with Alpha and Blue Ghost, we are on track for our spacecraft offerings to facilitate payload hosting services, transport services, utility services, and data services*** in [Low Earth Orbit], [Medium Earth Orbit], and [Geostationary Orbit].

27

87.     The Registration Statement also touted the strength of the Company's Spacecraft Solutions segment, stating that the segments performance "proves our capability to execute on challenging milestones" and that Firefly held a "competitive advantage" in the spacecraft business sector. Specifically, the Registration Statement stated:

> We are one of the few providers of lunar lander services with multiple planned launches under contracts and a multi-capability offering. *Our successful Blue Ghost mission this year proves our capability to execute on challenging milestones*: enter lunar orbit, measure radiation levels and the magnetic field in transit, land on the Moon, study the surface, and collect the most amount of data ever on the environment. *We expect our significant competitive advantage will grow as we continue to execute on our upcoming Blue Ghost missions*, with contracts already underway as part of NASA's $2.6 billion CLPS program.

### *Company Website Alpha Rocket Description*

88.     At all relevant times throughout the Relevant Period, the Company's website highlights the reliability of the Alpha rocket and describes it as "[r]eady for launch." Specifically, under the heading "Ready for Launch," the Company's website states:

> Firefly's Alpha rocket is equipped to launch more than 1,000 kg to low Earth orbit for commercial, civil, and national security missions. *The flight-proven vehicle is designed to support regular, rapid, and reliable launches with direct, ondemand deliveries when and where customers need to fly.* Alpha can be launched domestically or internationally through Firefly's launch facilities at the Vandenberg Space Force Base in California and new launch capabilities coming soon at the Mid-Atlantic Regional Spaceport (MARS) on Wallops Island, Virginia as early as 2026 and at the Esrange Space Center in Sweden as early as 2027.[2]

### *August 26, 2025 FAA Clearence Form 8-K*

89.     On August 26, 2025, the Company filed the FAA Clearence Form 8-K announcing that the FAA had cleared future Alpha rocket launches following the April 29, 2025, launch failure.

---

[2] Available at https://fireflyspace.com/alpha/ (last accessed Dec. 10, 2025).

The FAA Clearence Form 8-K touted the corrective actions taken by the Company, stating in relevant part:

> The company conducted a thorough investigation with the FAA and in parallel assembled an Independent Review Board of multiple government agencies, customers, and industry experts. The findings confirmed Firefly's flight safety system performed nominally through all phases of flight. Both Alpha stages landed safely in the Pacific Ocean and the launch posed no risk to public safety.
>
> ***
>
> Fortunately, ***the corrective actions are straight forward***: increase thermal protection system thickness on Stage 1 and reduce angle of attack during key phases of the flight. ***Corrective actions have already been implemented***.
>
> "At Firefly, technical challenges aren't roadblocks — they're catalysts," said Jordi Paredes Garcia, Alpha Chief Engineer at Firefly Aerospace. "Each mission provides us more data and enables us to continuously improve. ***Following all the lessons learned and corrective actions implemented, we were able to further increase Alpha's reliability***. We are grateful to the FAA, our customers, and the independent review board for their continued support through this process."
>
> ***With*** FAA approval to return to flight and ***corrective actions implemented***, Firefly is now working to determine the next available launch window for Alpha Flight 7.

90.    The statements in paragraphs ¶¶ 83-89 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the demand and growth potential in Firefly's Space Solutions segment was overstated; and (2) the Alpha rocket operational and commercial viability were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*September 22, 2025 Financial Reports*

91.     The truth began to emerge on September 22, 2025, when the Company issued the 2Q 2025 Earnings Press Release reporting disappointing financial results. The 2Q 2025 Earnings Press Release reported a loss of $80.3 million, or $5.78 per share, compared to a loss of $58.7 million, or $4.60 per share, for the second quarter of 2024. Additionally, the 2Q 2025 Earnings Press Release revealed Space Solutions revenue of $9.2 million, representing a decrease from $50.69 million in the previous quarter, and a decline from $18.09 million in the second quarter of 2024. The 2Q 2025 Earnings Press Release further revealed revenue of $15.55 million, missing analyst expectations of $17.25 million and representing a 26.2% decline from the second quarter of 2024.

92.     On this news, the price of the Company's stock fell $7.58 per share, or 15.3%, from a closing price of $49.52 per share on September 22, 2025 to close at $41.94 per share on September 23, 2025. However, the Individual Defendants continued to obfuscate the truth regarding the demand of its Space Solutions segment and the operational and commercial readiness of the Alpha rocket.

93.     For example, on that same day, the Company filed a Quarterly Report on Form 10-Q with the SEC for the second quarter of 2025 (the "2Q 2025 Form 10-Q"), which was signed by Defendants Kim and Ma. The 2Q 2025 Form 10-Q contained certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 signed by Defendants Kim and Ma attesting to the accuracy of the 2Q 2025 Form 10-Q and that the 2Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

94.    The 2Q 2025 Form 10-Q continued to represent the commercial viability of the Alpha rocket, stating in relevant part: "***We expect to continue to ramp up our launch cadence as we increase our production rate on Alpha rockets***, and complete development of Eclipse."

95.    Additionally, the Company also held an earnings call on September 22, 2025 to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Kim continued to highlight the operational readiness of the Alpha rocket, stating in relevant part "***[a]ll of Alpha's proven technologies*** are scaled up to our larger reusable Eclipse rocket, capable of carrying 16 tons to orbit."

96.    Later in the 2Q 2025 Earnings Call, Defendant Kim further represented the commercial prospects of the Alpha rocket, stating:

> First off, Alpha. ***It is a commercially available rocket***, and we're increasing our production capacity to deliver more and more Alphas per year. ***It can support launching surrogate targets for the Golden Dome missions. It could also support launching test missions of things like hypersonic missiles, as well as space-based interceptors. It also can serve as an operational rocket as well.***

97.    The following exchange occurred during the question-and-answer session of the 2Q 2025 Earnings Call, between an analyst and Defendant Kim regarding future test launches of the Alpha rocket as the Company had regained FAA clearance a few weeks prior:

> Q: With the FAA approving return to flight for Alpha, how are you thinking about the timing of flight seven and eight, and how does that feed into your targeted launches for 2026? What are the range of potential outcomes for next year, you know, thinking about production capacity versus the current backlog?

> Defendant Kim: Thank you . . . . We received our FAA return to flight determination at the end of August. ***We expect to launch flight seven in the coming***

*weeks*. If you saw our slides in the Alpha slide, you could see that ***flight seven is in a mature state right next to flight eight in a mature state.***

98.    The statements in paragraphs ¶¶ 93-97 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the demand and growth potential in Firefly's Space Solutions segment was overstated; and (2) the Alpha rocket's operational and commercial viability was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Fully Emerges**

***September 29, 2025 Alpha Launch Failure Website Disclosure***

99.    The truth fully emerged on September 29, 2025, when the Company posted the Alpha Launch Failure Website Disclosure. The Alpha Launch Failure Website Disclosure stated that "[d]uring testing at Firefly's facility in Briggs, Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event that resulted in a loss of the stage."

100.    On this news, the price of the Company's stock fell $7.64 per share, or 20.7%, from a closing price of $36.96 per share on September 29, 2025 to close at $29.32 per share on September 30, 2025.

**DAMAGES TO FIREFLY**

101.    As a direct and proximate result of the Individual Defendants' misconduct, Firefly has lost and expended, and will continue to lose and expend, many millions of dollars.

102.    Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

103.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

104.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

105.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

106.    As a direct and proximate result of the Individual Defendants' conduct, Firefly has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act.

## DERIVATIVE ALLEGATIONS

107.    Plaintiff brings this action derivatively and for the benefit of Firefly to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Firefly, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of the Securities Act and the Exchange Act.

108.    Firefly is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Firefly. Plaintiff will adequately and fairly represent the interests of Firefly in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

110.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

111.    A pre-suit demand on the Board of Firefly is futile and, therefore, excused. At the time of filing this action, the Board consists of the following nine individuals: Defendants Kim, Boland, Braden, Emerson, Konert, Lusczakoski, McAllister, Weiser, and Zurbuchen (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of nine Director-Defendants who are on the Board at the time this action is commenced.

112.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate

the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

113.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Firefly to issue materially false and misleading statements. Specifically, the Director-Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

114.    Additional reasons that demand on Defendant Kim is futile follow. Defendant Kim has served as the Company's CEO and as a Company director since October 2024. The Company provides Defendant Kim with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Kim also signed the false and misleading Registration Statement and 2Q 2025 Form 10-Q. Moreover, Defendant Kim is a defendant in the Securities Class Action. For these reasons, too, Defendant Kim breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Boland is futile follow. Defendant Boland has served as a Company director since the Company's IPO on August 7, 2025. He also serves as the Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Boland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Braden is futile follow. Defendant Braden has served as a Company director since the Company's IPO on August 7, 2025. She also serves as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Braden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Emerson is futile follow. Defendant Emerson has served as a Company director since September 2022. He also serves as a member of

the Nominating and Corporate Governance Committee. In the Registration Statement, the Company admits that Defendant Emerson is not independent. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Emerson also signed the false and misleading Registration Statement. Further, Defendant Emerson is a defendant in the Securities Class Action. For these reasons, too, Defendant Emerson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Konert is futile follow. Defendant Konert has served as a Company director since March 2022. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. In the Registration Statement, the Company admits that Defendant Konert is not independent. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Konert also signed the false and misleading Registration Statement. Further, Defendant Konert is a defendant in the Securities Class Action. For these reasons, too, Defendant Konert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Lusczakoski is futile follow. Defendant Lusczakoski has served as a Company director since the Company's IPO on August 7,

2025. He also serves as a member of the Compensation Committee. In the Registration Statement, the Company admits Defendant Lusczakoski is not independent. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lusczakoski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant McAllister is futile follow. Defendant McAllister has served as a Company director since the Company's IPO on August 7, 2025. He also serves as the Chair of the Nominating and Corporate Governance Committee. In the Registration Statement, the Company admits Defendant McAllister is not independent. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant McAllister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Weiser is futile follow. Defendant Weiser has served as a Company director since October 2024. He also serves as a member of the Compensation Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Weiser also signed the false and misleading Registration Statement. Further, Defendant Weiser is a defendant in the Securities Class Action. For these reasons, too, Defendant Weiser breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Zurbuchen is futile follow. Defendant Zurbuchen has served as a Company director since May 2025. He also serves as a member of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Zurbuchen also signed the false and misleading Registration Statement. Further, Defendant Zurbuchen is a defendant in the Securities Class Action. For these reasons, too, Defendant Zurbuchen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on the Board is futile follow.

124.    Defendants Boland (as Chair), Braden, and Konert (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and

regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Securities Act and the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

125.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

126.    Firefly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to

recover for Firefly any part of the damages Firefly suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

127.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

128.    The acts complained of herein constitute violations of fiduciary duties owed by Firefly's directors and/or officers, and these acts are incapable of ratification.

129.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Firefly. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Firefly, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

130.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Firefly to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

131.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Firefly's business and affairs.

134.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

135.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Firefly.

136.    In breach of their fiduciary duties owed to Firefly, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the demand and growth potential in Firefly's Space Solutions segment was overstated; and (2) the Alpha rocket operational and commercial viability were overstated.  As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

137.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

138.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

139.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Firefly's securities.

140.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Firefly's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

141.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

142.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Firefly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

144.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Firefly.

44

146.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Firefly that was tied to the performance or artificially inflated valuation of Firefly or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

147.    Plaintiff, as a shareholder and a representative of Firefly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

148.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Firefly, for which they are legally responsible.

151.    As a direct and proximate result of the Individual Defendants' abuse of control, Firefly has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Firefly in a manner consistent with the operations of a publicly-held corporation.

155.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Firefly has sustained and will continue to sustain significant damages.

156.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

157.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

158.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

160.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Firefly to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

161.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

162.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Kim, Ma, Wu, Garcia, Konert, Markusic,  Weiser, McCaleb, Zurbuchen, and Emerson for Contribution Under Section 11 (f) of the Securities Act and 21D of the Exchange Act**

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

164.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Firefly shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act and Sections 10(b), 20(a), and Rule 10b-5 of the Exchange Act.

165.    Federal law provides Firefly with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

166.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

167.     Firefly is the registrant for the IPO. Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, McCaleb, Zurbuchen, and Emerson were responsible for the contents and dissemination of the Registration Statement.

168.     As issuer of the shares, Firefly is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

169.     The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

170.     Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, McCaleb, Zurbuchen, and Emerson, because of their positions of control and authority as officers and/or directors of Firefly, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Firefly, including the wrongful acts complained of herein and in the Securities Class Action.

171.     Accordingly, Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, McCaleb, Zurbuchen, and Emerson are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

172.     As such, Firefly is entitled to receive all appropriate contribution or indemnification from Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, McCaleb, Zurbuchen, and Emerson.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Firefly, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Firefly;

(c)    Determining and awarding to Firefly the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Firefly and the Individual Defendants to take all necessary actions to reform and improve Firefly's corporate governance and internal procedures to comply with applicable laws and to protect Firefly and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Firefly to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e)     Awarding Firefly restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.


Dated: December 23, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*<u>/s/ Saadia Hashmi</u>*
Saadia Hashmi (TX# 24139546)
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Kiaran Shadowbolt, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of December, 2025.

DocuSigned by:

0243ED0AA4B1449

Kiaran Shadowbolt